

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

```
******************************************************************
                              *
LARRY BRAUN, JOHN BRAUN,      *    CIV 04-1007
and SHERWIN SCHWAB,           *    2006 D.S.D. 2
                              *
        Plaintiffs,           *
                              *
    -vs-                      *    OPINION AND ORDER
                              *
E.I. DU PONT DE NEMOURS AND   *
COMPANY¹ and PIONEER HI-BRED  *
INTERNATIONAL, INC.,          *
                              *
        Defendants.           *
                              *
******************************************************************
```

**KORNMANN, U.S. DISTRICT JUDGE**

### INTRODUCTION

[¶1]   Plaintiffs brought suit in the South Dakota Circuit Court for the Fifth Judicial Circuit alleging negligence, *res ipsa loquitur*, and defamation arising out of 2001 crop failures alleged to be caused by defective herbicides manufactured and sold by E.I. du Pont de Nemours and Company ("DuPont"). Defendants removed the case to federal court pursuant to 28 U.S.C. § 1341 on the basis of diversity jurisdiction, 28 U.S.C. § 1332. The defamation count was dismissed pursuant to the parties' stipulation. Thereafter, plaintiffs sought leave to amend their complaint to allege contract claims which had become apparent during discovery. Although plaintiffs failed to attach a copy of the proposed amended complaint (as required by D.S.D. LR 15.1), the motion was unopposed and was granted. Plaintiffs filed an amended complaint alleging negligence, *res ipsa loquitur*, breach of contract, strict liability, and fraud and intentional misrepresentation. Plaintiffs also added a claim for punitive damages. Defendants filed a motion

---

¹ The parties stipulated, Doc. 29, that defendant E.I. du Pont De Nemours and Company was erroneously named "a division of du Pont" in the caption. Based upon that stipulation, the caption is amended to reflect the correct party name.

to strike the latter two claims as unauthorized amendments and filed a motion for summary judgment on all counts.

**DECISION**

[¶2]  Summary Judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Donaho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996). Rule 56(c) " mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th Cir. 1995). In considering a motion for summary judgment, this Court must view the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from the facts. Donaho, 74 F.3d at 897-98.

[¶3]  Most of the facts material to the motion are not in dispute.[2] However, what Pioneer is doing in this lawsuit is not fathomable. No allegations are even made against Pioneer. Plaintiffs purchased DuPont's herbicides Authority® and Basis® from North Central Farmers Elevator ("Elevator") in the Spring of 2001 for application on their corn and soybean crops.[3] The labels, which include limitations of warranty and liability, were approved by the Environmental Protection Agency pursuant to the Federal Insecticide, Fungicide and Rodenticide Act

---

[2] Defendants submitted a statement of undisputed material facts as required by D.S.D. LR 56.1(B). Plaintiffs did not set forth a "statement of the material facts as to which it is contended that there exists a genuine issue to be tried" and did not respond to each numbered paragraph in defendants' statement of facts as required by D.S.D. LR 56.1(C). Instead, plaintiffs submitted an affidavit of counsel with portions of three depositions attached as exhibits. As required by D.S.D. LR 56.1(D), all material facts set forth by the defendants are deemed to be admitted.

[3] The product labels included in the summary judgment materials show that DuPont is the manufacturer of Authority® and Basis®. Pioneer denied in its answer that it was involved in any way in the manufacture or sale of Authority® and Basis® to plaintiffs.

2

("FIFRA"), 7 U.S.C. § 136 *et seq*. There is no claim by plaintiffs that the disclaimers of warranty and the limitation of damages provisions on the label were not conspicuous. As a matter of law, they were conspicuous, whether or not plaintiffs bothered to read them.

[¶4]  John Raisler ("Raisler"), DuPont's agent, promised that Authority® and Basis® would work to control the weeds in plaintiffs' corn and soybean fields and that DuPont would "pay for up to the value of the product" if a "second in-crop application" was necessary. In other words, Raisler promised plaintiffs that DuPont "would provide a re-spray if needed." The warranty accompanying Authority® and Basis® promised that the limited remedy for failure of the product to perform "shall be the product, or at the election of DuPont or seller, the replacement of the product." What Raisler told plaintiffs matches what the written warranty states. Plaintiff John Braun testified at his deposition that he believed he was going to get a discount on the cost of the product needed for a re-spray.

[¶5]  Larry Braun and Sherwin Schwab hired an independent contractor to spray their own fields. John Braun personally sprayed his own fields. Plaintiffs allege that DuPont's products did not control the weeds in their fields. Greg Volk, an employee of the Elevator, contacted Raisler in June of 2001, asking him to look at a field "for the Brauns," apparently, although not found in the record, to determine whether to "authorize" a re-spray of certain fields. Raisler looked at those fields. Raisler did "authorize" a re-spray paid for by DuPont of approximately 2,200 acres in Western South Dakota near the Missouri River. Raisler testified that he did not "settle" the claims at issue in this case.

[¶6]  Sherwin Schwab claims some of his fields needed to be re-sprayed. He did not hire sprayers because he did not want to pay for those services. He was hoping DuPont would pay for the chemical. John Braun did buy extra product to re-spray some of his corn fields. He "got a good burn" out of the product applied but it did not have the residual (post-emergent) effect he hoped would occur. He complained at his deposition about the "delayed time" in getting back in the fields.

[¶7]  The record is not particularly clear as to whether all plaintiffs did re-spray and, if so, when. Their complaint is based in part upon the allegation that DuPont did not <u>timely</u> "authorize" a re-spray and therefore any re-spray was delayed. Plaintiffs alleged that the fields

3

sprayed with DuPont's products did not reach their proper maturity and the foregoing caused a loss of yield in some of those fields. These allegations, however, were never set forth in a statement of facts as required by D.S.D. LR 56.1(C).

## I. Economic Loss Doctrine.

[¶8] The governing substantive law in a case removed to federal court in South Dakota based on diversity of citizenship is South Dakota law. Hartford Accident and Indemnity Co. v. Stauffer Chemical Co., 741 F.2d 1142, 1145 (8th Cir. 1984). Defendants contend that South Dakota's economic loss doctrine bars plaintiffs' recovery of lost profits under their tort theories. The economic loss rule holds that economic losses arising out of commercial transactions are not recoverable under tort theories but are instead limited to the commercial theories found in the Uniform Commercial Code ("UCC"). City of Lennox v. Mitek Industries, Inc., 519 NW2d 330, 333 (SD 1994). The South Dakota Supreme Court expressly recognized the rule and its rationale:

> [T]he Code not merely permits but also encourages negotiated agreements concerning all aspects of a commercial transaction including warranties, warranty disclaimers, and liability limitations. The foundational assumption of the Code as a whole is that by importing to their negotiations their experience in the marketplace, the reasonable contemplation of sophisticated parties is embodied in the transaction. It is at the time of the contract formation that experienced parties define the product, identify the risks, and negotiate a price of the goods that reflects the relative benefits and risks to each.

City of Lennox v. Mitek Industries, Inc., 519 NW2d at 333 (*quoting* Hapka v. Paquin Farms, 458 NW2d 683, 688 (Minn.1990)).

[¶9] Under South Dakota law, courts must follow a two-step analysis in applying the economic loss rule. Diamond Surface, Inc. v. State Cement Plant Com'n, 1998 SD 97, ¶ 24, 583 NW2d 155, 161. First, we must determine "whether the transaction was a sales transaction which would bring it within the scope of the UCC" and, if so, we must determine "whether the losses claimed under the negligence causes of action are recoverable in tort or whether the UCC provisions are exclusive." *Id.* (*citing* Mitek Industries, Inc., 519 NW2d at 333).

[¶10] In the present case, plaintiffs complain that the herbicides applied to their crops failed. When goods and services are sold together (which is not true in this case), the court would

4

normally determine whether the predominate purpose of the contract was one for the rendition of a service (application of the herbicides) with goods incidentally involved or a transaction for the sale of goods (herbicides) with labor incidentally involved. Mitek Industries, Inc., 519 NW2d at 332. Plaintiffs have not sued the applicator (an independent contractor in the case of Larry Braun and Sherwin Schwab; John Braun did his own application) nor do they allege negligence in the application of the herbicides. To the contrary, they claim that, absent some product defect, the herbicides should have worked to eradicate the weeds in plaintiffs' fields. Clearly the UCC applies "since the predominate purpose of the transaction was the sale of 'goods' as defined by SDCL 57A-2-105(1)." Diamond Surface, Inc., 1998 SD 97, ¶ 24, 583 NW2d at 161. Because the UCC governs, the court must determine whether the losses claimed under the negligence causes of action are recoverable in tort or whether plaintiffs are limited to the exclusive remedies under the UCC. Mitek Industries, 519 NW2d at 333.

[¶11] Losses "resulting from the failure of the product to perform to the level expected by the buyer" and consequential losses "such as lost profits" are economic losses. Mitek Industries, Inc., 519 NW2d at 333, Diamond Surface, Inc., 1998 SD 97, ¶ 25, 583 NW2d at161, (*citing* Hapka v. Paquin Farms, 458 NW2d at 688). Generally, those economic losses are not recoverable under tort theories. The two recognized exceptions to the economic loss rule are when personal injury is involved or when the damage is to "other property" that is collateral to the product itself. Diamond Surface, Inc., 1998 SD 97, ¶ 25 n. 5, 583 NW2d at 161 n. 5. There is no allegation of personal injury involved here.

> Examples of damage to other property include: 1) defective heater that exploded and destroyed a major portion of a refinery; 2) defective brakes that hypothetically caused truck to run into home. When a defect in a component part damages the product into which that component was incorporated, economic losses to the product as a whole are not losses to "other property" and are therefore not recoverable in tort.

Mitek Industries, Inc., 519 NW2d at 333. The herbicides were intended to be and were applied to fields with growing or pre-emergent crops. In essence, the herbicides became component parts of the growing crops. Losses suffered to crop yields are economic losses not recoverable in tort. Defendants are entitled to summary judgment on plaintiffs' tort claims under counts 1, 2, and 4 of the amended complaint.

5

## II. *Res Ipsa Loquitur.*

[¶12]   The South Dakota Supreme Court has held that "the res ipsa loquitur doctrine is primarily a rule of evidence. It is not an issue to be pleaded in the complaint nor need it be 'noticed' by specific designation to the adverse party at pretrial or at trial for it is neither a cause of action nor a ground for recovery." Shipley v. City of Spearfish, 235 NW2d 911, 913 (SD 1975) (internal citation omitted). *Accord*, Carr v. Core Industries, 392 NW2d 829, 829 n.1 (SD 1986). Count 2 of the amended complaint fails to state a claim upon which relief may be granted, thus entitling defendants to summary judgment as to Count 2 of the amended complaint.

## III. Limitation of Liability.

[¶13]   Defendants contend that the labels on Authority® and Basis® contain warranties which operate to limit liability and bar plaintiffs' claims for loss of yield. DuPont specifically warranted that the product "conforms to the chemical description on the label thereof" and that if the product fails to conform,

> in no event shall DuPont or seller be liable for any incidental, consequential or special damages . . . The exclusive remedy of the user or buyer and the exclusive liability of DuPont or seller . . . shall be the product, or at the election of DuPont or seller, the replacement of the product.

DuPont specifically limited its warranties to those which were written on the label and set forth that the "limitation of warranty and liability may not be amended by any oral or written agreement." Plaintiffs contend that the express warranty made by Raisler contained no limitation on recovery for yield loss and that the limitation or exclusion of consequential damages is unconscionable. Certainly Raisler did not orally broaden the written limited warranty nor did he alter the clear language as to limitation of damages.

[¶14]   The South Dakota Uniform Commercial Code ("UCC") provides:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

SDCL § 57A-2-719(3). As to unconscionable contracts or contract clauses, the UCC provides:

6

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
>
> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

SDCL § 57A-2-302.

[¶15] In 1982, the South Dakota Supreme Court held that warranty disclaimers and limitation of consequential damages clauses set out in a herbicide label were unconscionable and against public policy because they "would leave the pesticide user without any substantial recourse for his loss." Durham v. Ciba-Geigy Corp., 315 NW2d 696, 700 (SD 1982).

> In this case, loss of the intended crop due to ineffectiveness of the herbicide is inevitable and potential plaintiffs should not be left without a remedy. Furthermore, the purchasers of pesticides are not in a position to bargain with chemical manufacturers for contract terms more favorable than those listed on the pre-printed label, nor are they in a position to test the effectiveness of the pesticide prior to purchase.

Id. The South Dakota Supreme Court subsequently relied upon the Durham decision in Hanson v. Funk Seeds International, 373 NW2d 30, 34-35 (1985), wherein it was held, in Part II of the decision, that warranty disclaimers and limitation of consequential damages clauses set out in a seed corn label were unconscionable. The South Dakota Supreme Court specifically noted the differences between the herbicide at issue in Durham and the seed corn at issue in Hanson:

> Although the product in *Durham* was manufactured and the product here in question, to wit, corn seed (*sic*), is a product of nature, the process used in marketing both products is nearly identical so as to permit application of the considerations found relevant in *Durham*.

Id. at 35.

[¶16] Six months after the Hanson decision, the South Dakota Legislature passed Senate Bill 49 which provided:

7

AN ACT

ENTITLED, An Act to restrict the circumstances under which certain express warranties may be modified.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF SOUTH DAKOTA:

The ruling in Decision II of Hanson v. Funk Seeds International, 373 N.W.2d 30 (S.D. 1985) is hereby abrogated.

1986 Session Laws, Chapter 410 (set out in the Commission Notes to SDCL § 57A-2-302 and SDCL § 57A-2-719). The parties disagree whether the abrogation of the decision in Hanson results in abrogation of the decision in Durham as well. Clearly, if the intent of the legislature was to abrogate the rulings in both cases, the legislature knew how to do that. I note that a portion of the "ruling" in Hanson was abrogated. There is no statement that any principles of law adopted in the case were abrogated. This court would, of course, have no authority to add to or alter any statutory language used by the legislature.

[¶17] By making specific reference to Hanson and no reference to Durham, it is entirely reasonable to conclude that the legislature determined that pesticide users (such as in the case before the court) are to be protected against unconscionable disclaimers whereas purchasers of seed corn are not. Hanson significantly broadened the principles of law applied in Durham. The legislature may well have concluded that the South Dakota Supreme Court had "gone too far" in Hanson. As then Circuit Court Judge Miller (later Chief Justice of the South Dakota Supreme Court) stated in his concurrence in part and dissent in part in Hanson: "It must be emphasized that this case differs from the usual breach of warranty action because it does not involve manufactured goods, as was the case in Durham v. Ciba-Geigy Corp., 315 NW2d 696 (SD 1982) and Swenson v. Chevron Chemical Co., . . . 234 NW2d 38 (1975). Rather, appellant is a distributor of a product of nature, namely seeds." Hanson, 373 NW2d at 36 (Miller, Circuit Judge, concurring).

[¶18] Hanson involved interpretations of the Federal Seed Act, 7 U.S.C. § 1551 et seq., as such statute existed in 1985, and the South Dakota Seed Act, formerly SDCL 38-12 and later SDCL 38-12A. Such statutes were not even involved in Durham, much less interpreted.

8

[¶19] South Dakota has no significant legislative history in any given year which might otherwise be helpful to courts interpreting what was done legislatively. We know also that source notes, cross-references, and titles "constitute no part of any statute." SDCL 2-14-9. The legislative enactment in question is really not ambiguous. It deals with Hanson and not Durham. Assuming there is some valid claim of ambiguity, the court may look to the legislative history (such as it is), the title, and the total content of legislation so as to ascertain its meaning. LaBore v. Muth, 473 NW 2d 485 (SD 1991). LaBore relied on In re Certification of Question of Law, 401 NW2d 340 (SD 1987), Oahe Conservancy Subdistrict v. Janklow, 308 NW 2d 559 (SD 1981), and Elfring v. Paterson, 285 NW 443 (SD 1939). I therefore note that the title to the 1986 legislative act was: "Warranty Disclaimers Validated that Limit Damages for the Use of Seed Corn to the Return of the Purchase Price." (emphasis supplied).

[¶20] The court takes judicial notice of certain well known facts. One such fact is that many farmers in South Dakota produce and sell seed corn. That practice was much more common in 1986 when the legislature "abrogated" the ruling in Hanson. Farmers, many of whom were members of the legislature, in a much greater number than these days, could easily have seen themselves as sellers of seeds and not anxious to be sued. A permit to be a seed dealer in South Dakota is normally required. However, since at least 1988, no permit is required of any person selling or advertising seed of the person's own production in South Dakota, "if the seed is stored or delivered to a purchaser only on or from the farm or premises where grown or the production and sale of seed is not a primary endeavor and primary source of income to such persons." SDCL 38-12A-11. Farmers were not, of course, producing or selling pesticides. They were, however, purchasing and using pesticides. Citizen legislators cannot avoid considering their own personal circumstances and how any rule of law or statute might impact them, as well as their constituents. They routinely do that. This is not to say that the legislature differs that much from what goes on in Congress. As has often been observed, the best lobbyists are inside the chambers, not outside in the lobbies.

[¶21] I hold that Durham is still "good law" in South Dakota and I am bound by it.

[¶22] The South Dakota Supreme Court relied upon Durham and Hanson to find that the limitation of liability found on sorghum seed was unconscionable in Schmaltz v. Nissen, 431

9

NW2d 657, 662 (SD 1988). The cause of action in Schmaltz arose prior to 1986 and the South Dakota Supreme Court declined to apply the abrogation retroactively. *Id.* at 663. *See also* Herrick v. Monsanto Co., 874 F.2d 594, 596 (8th Cir. 1989) (applying Durham because the cause of action arose in the spring of 1985). Although it may be dicta, I note a discussion in Herrick that is at least interesting. The court of appeals first made reference to the action of the South Dakota Legislature in 1986. "Monsanto asserts that the 1986 statute also implicitly abrogates *Durham*. We disagree, relying on South Dakota precedent." Herrick, 874 F.2d at 596.

[¶23] Even assuming that Durham has been legislatively abrogated, there are other matters to be considered in the case before the court. There is no indication in Chapter 410 of the 1986 Session Laws that the South Dakota Legislature intended to abrogate any of the principles of unconscionability found in the UCC. If the legislature intended to do so it would have been a simple matter to amend the relevant portions of the UCC. Repeals or amendments by implication are not to be permitted. The legislature did not amend SDCL § 57A-2-719(3) or § 57A-2-302. Rynders v. E.I. Du Pont De Nemours & Co., 21 F.3d 835, 840 n. 6 (8th Cir. 1994).[4] I am still required by SDCL § 57A-2-302 to determine whether, as a matter of law, the limitations of remedy and liability provisions on the labels at issue in this case were unconscionable.[5] The plaintiffs bear the burden of proving that the limitation of liability

---

[4]The open courts provision of the South Dakota Constitution, Article VI, § 20, has been read as a guarantee that the courts shall be open and afford those remedies provided for by the common law and statutes of the state. Kyllo v. Panzer, 535 NW2d 896, 900-901 (SD 1995). Although the Legislature can "change the remedy or the form of procedure, attach conditions precedent to its exercise, [or] perhaps abolish and substitute new remedies, it cannot deny a remedy entirely." *Id.* (*quoting* Mattson v. City of Astoria, 39 Or. 577, 577, 65 P. 1066, 1067 (1901)). "Obviously, the legislature can abrogate the rights that flow from legislative acts and statutes. They can do so simply by repealing the statute from which the rights flow." Baatz v. Arrow Bar, 426 NW2d 298, 302 (SD 1988). Similarly, in order to abrogate a common-law principle, a statute must "speak directly" to the abrogation of that principle. United States v. Texas, 507 U.S. 529, 534, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993). The legislature has not abrogated the unconscionability remedies set forth in the UCC.

[5]Defendants claim in their brief that SDCL § 57A-2-719(3) provides that a limitation of damages clause in the case of a mere commercial loss is *prima facie* conscionable. To the contrary, that section provides that where a personal injury results, limitation of consequential damages "is *prima facie* unconscionable but limitation of damages where the loss is commercial

10

provisions contained in the herbicide labels at issue here are unconscionable. Golden Reward Mining Co. v. Jervis B. Webb Co., 772 F.Supp. 1118, 1122 (D.S.D. 1991). Unconscionability is to be determined at the time of the making of the contract. *Id.* at 1123.

[¶24] The South Dakota Supreme Court has distinguished between procedural unconscionability and substantive unconscionability. Johnson v. John Deere Co., 306 NW2d 231, 237 (SD 1981).

> The former deals with the process of making the contract, including a meaningful choice. White & Summers suggests that it proximates the common law of fraud and duress. The latter category deals with the overly harsh or one-sided terms. White & Summers compares this with the common-law clauses held contrary to public policy.

*Id.* (*quoting* Leff, Unconscionability and The Code--The Emperor's New Clause, 115 U.Pa.L.Rev. 485 (1967)).

> The text writers indicate that the bulk of successful cases under U.C.C. § 2-302 deal with the unprotected and unsuspecting consumers in the market for consumer goods, often the victims of sharp practices: the over-priced stereos, the unreasonably favorable security devices, the illiterate buyer, and the fine-printed clauses. "(C)ourts have not been solicitous of business men in the name of unconscionability. In the last decade, however, a few courts may have found mere procedural unconscionability determinative, even in commercial settings." White & Summers, supra at 170.

*Id.*

[¶25] I will first address procedural unconscionability. Defendants argue that plaintiffs are not ordinary consumers but rather are knowledgeable and experienced buyers of agricultural products who knew or at least were not surprised to find that the labels contained limitations of damages provisions. Of course, "courts are much more inclined to sustain the U.C.C. § 2-302 attack in the case of the downtrodden consumer than they are in the case of the commercial consumer who presumably has a far more meaningful choice." Johnson v. John Deere Co., 306 NW2d at 238. *See also* Golden Reward Mining Co. v. Jervis B. Webb Co., 772 F.Supp. at 1123.

---

is not." There is a very significant difference between not being *prima facie* unconscionable and being *prima facie* conscionable.

11

[¶26] It is clear that the labels at issue attempt to contain an exclusive remedy provision which limits liability to the cost of the product or replacement of the product (i.e., pay for the cost of the product to re-spray). DuPont's agent acknowledged that, if the products failed to control the weeds, re-spraying was indeed part of the "program" purchased by the plaintiffs when they purchased Authority® and Basis®. Raisler, according to plaintiffs, told Larry Braun (who in turn relayed that promise to the other two plaintiffs) that, if the products did not work, plaintiffs would be reimbursed for re-spraying. In essence, this is exactly what the label said, i.e., replace the product. There is not even an allegation that anyone represented to plaintiffs that crop losses would be covered. Raisler promised just what was contained in the labels' written warranties - a product replacement remedy.

[¶27] The limitation of consequential damages provision contained in the herbicide product labels was not negotiated. Although the plaintiffs could be described as commercial farmers, they are in no better position than any other farmer to negotiate contract provisions. There is no negotiation. The labels are attached to each container of herbicide. It is a take it or leave it proposition. The undisputed facts are that all herbicides available on the market contain similar provisions. Plaintiffs can avoid the limitation of remedies and consequential damages provisions only by electing to apply no herbicides to their crops. Plaintiffs here are also in no better position than any less experienced farmer to determine whether the product will fail. Possible failure is apparent only after the product is used and the growing season is advanced.

[¶28] Genuine issues of material fact exist which preclude summary judgment in favor of DuPont on the issue of procedural unconscionability.

[¶29] Substantive unconscionability is more complicated in this case. The purpose of the herbicides was to control weeds, thus increasing yields. Where the product fails, lost profits necessarily result. However, a re-spray would presumably ameliorate at least some yield loss. The effect of DuPont's alleged failure to timely abide by the re-spray remedy clauses is to cause additional consequential damages. In effect, essentially plaintiffs have no remedy when the product fails and DuPont breaches even the product replacement remedy provision.

[¶30]   DuPont allegedly failed to abide by that warranty. Plaintiffs claim that if DuPont had timely re-sprayed plaintiffs' fields, the plaintiffs' damages would have been mitigated in that yields would have been better.

> The majority of the courts in cases involving the failure of an exclusive remedy contained in a warranty provision which also excludes liability for consequential damages have ruled that the provisions limiting liability fail also and that the plaintiffs are entitled to the full array of remedies provided by the UCC, including the recovery of consequential and incidental damages.

Johnson v. John Deere Co., 306 NW2d at 237. Thus, all other questions aside, DuPont cannot shelter itself behind the claimed limitation of consequential damages provision of the warranty when it allegedly repudiated its limited obligation to re-spray under another provision of the warranty, "which alleged repudiation has caused the very need for relief which the defendant is attempting to avoid." Johnson v. John Deere Co., 306 NW2d at 237 (*quoting* Jones & McKnight Corp. v. Birdsboro Corporation, 320 F.Supp. 39, 43-44 (N.D. Ill.1970)).

[¶31]   The difficulty in this case with reliance upon substantive unconscionability is that it is not clear from the record what exactly the parties contemplated by the terms of the product replacement remedy. The terms "pay for a re-spray" and "settle" the claims have been used. There is also reference to the timeliness of notifying DuPont's agent of the alleged product failures and the timeliness of the agent's response thereto. The record alludes to Raisler's position being similar to an insurance adjuster who is notified of a loss, inspects the loss, and adjusts or "settles" claims. Did DuPont have the obligation to pay for a re-spray in advance or to simply reimburse plaintiffs after they had purchased new herbicide and paid for the re-spray?

[¶32]   The court also notes, however, that, under the UCC, plaintiffs can recover only consequential damages for crop failures resulting from DuPont's breach "which could not reasonably be prevented by cover." SDCL 57A-2-715. Questions exist as to whether plaintiffs acted reasonably to mitigate damages or to "cover." "Those experiencing damage cannot allow injury to continue and increase without expending reasonable effort to avoid further loss." Wasland v. Porter Auto & Marine, Inc., 1999 SD 134, ¶12, 600 NW2d 904, 907 (citing Davis v. Knippling, 1998 SD 31, ¶ 13, 576 NW 2d 525, 529). *See also* O'Brien v. Isaacs, 116 NW2d 246, 249 (Wis. 1962) (declaring that a plaintiff must do all that is reasonable to mitigate damages

13

deriving from a breach of contract). (*Cited* with approval in Ziegler Furniture and Funeral Home, Inc. v. Cicmanec, 2006 SD 6, ___ NW2d ___ ).

[¶33] Genuine issues of material facts exist which preclude summary judgment in favor of DuPont on the issue of substantive unconscionability.

### IV. Lack of Privity.

[¶34] DuPont contends that plaintiffs' breach of contract claims fail for lack of privity of contract because the herbicides at issue were purchased from the Elevator, an authorized dealer. "A contract obligation is ordinarily due only to those with whom it is made." Parker v. Western Dakota Insurors, Inc., 2000 SD 14, ¶ 9, 605 NW2d 181, 184. Plaintiffs' breach of contract claims are premised on the promises made in the labels and by DuPont's agent, Raisler, that Authority® and Basis® would control the weeds in plaintiffs' corn and soybean fields and DuPont would reimburse plaintiffs for the cost of re-spray if those products did not control the weeds. Plaintiffs' breach of contract claims do not arise out of promises made by the Elevator. "South Dakota has adopted the most liberal privity alternative of the Uniform Commercial Code. SDCL 57A-2-318." Agristor Leasing v. Spindler, 656 F.Supp. 653, 656 (D.S.D. 1987) ("Consequently, it is unnecessary for South Dakota courts to expand strict liability theories to cover economic losses."). That section provides: "A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section." Thus, the contract provisions set forth in the herbicide labels extend to plaintiffs. There is no basis for summary judgment on the breach of contract claims based upon claimed lack of privity.

### V. Preemption.

[¶35] DuPont contends that FIFRA preempts plaintiffs' common law claims. The Supremacy Clause of the U.S. Constitution, Art. VI, invalidates state common law claims that interfere with or are contrary to federal law. National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602 607 (8th Cir. 1999). FIFRA, 7 U.S.C. § 136 *et seq.*, regulates the use, sale and labeling, of pesticides. Bates v. Dow Agrosciences LLC, ___ U.S. ___, ___, 125 S.Ct. 1788, 1794, 161 L.Ed.2d 687 (2005). "For purposes of our discussion of FIFRA, the term 'pesticides' includes

14

herbicides, insecticides, fungicides, rodenticides, and plant regulators. *See* §§ 2(t) and (u) of FIFRA, as amended, 7 U.S.C. §§ 136(t) and (u)." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 990 n. 1, 104 S.Ct. 2862, 2866 n. 1, 81 L.Ed.2d 815 (1984). 7 U.S.C. § 136v(b) prohibits states from imposing or continuing in effect "any requirements for labeling or packaging in addition to or different from those required under this subchapter." The United States Supreme Court held this past summer that:

> Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging." None of these common-law rules requires that manufacturers label or package their products in any particular way. Thus, petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not pre-empted.

Bates v. Dow Agrosciences LLC, ___ U.S. at ___, 125 S.Ct. at 1798.

[¶36] Plaintiffs' tort claims that 1) DuPont negligently allowed the herbicides sold to plaintiffs to be contaminated with other chemicals detrimental to corn and soybean crops, and 2) the products were therefore defective and unreasonably dangerous, thus warranting strict liability, are in the nature of claims arising out of a claimed manufacturing defect. If plaintiffs are successful, it would not require DuPont to label or package its products differently, only to ensure that its products comply with the labels. Plaintiffs' negligence claims in Counts 1 and 4 of the amended complaint are not preempted by FIFRA. As set forth previously, however, defendants are entitled to summary judgment as to those claims.

**VI. Breach of Warranties.**

[¶37] Defendants contend that they are entitled to summary judgment on plaintiffs' breach of implied warranty claims. Plaintiffs make no such claims. The only contract causes of action are for breach of express warranty that the herbicides would work to control the weeds and that DuPont would pay to re-spray in the case of product failure. Plaintiffs refer to "the breach of warranty both implied and express" in ¶ 9 of their amended complaint. However, that was merely a gratuitous reference in their claimed negligence cause of action. It is surplusage and of no legal significance.

15

[¶38] Defendants contend that plaintiffs have failed to produce any evidence or expert opinion that the Authority® and Basis® products that were applied to plaintiffs' fields were contaminated. Because plaintiffs admitted that variables (such as soil compaction, the cold and wet spring, or other environmental factors) could cause poor yields, defendants contend that it would be speculation for a jury to conclude that DuPont breached a warranty by providing defective herbicides.

[¶39] The plaintiffs are not required to present direct evidence of a defect in the herbicides but must only present sufficient evidence, direct or circumstantial, to permit the inference that the herbicides were defective when they left DuPont's possession or control and such defect was the cause of the crop failures and plaintiffs' damages. Schmaltz v. Nissen, 431 NW2d 657, 663 (SD 1988).

> "No specific defect must be shown if the evidence, direct or circumstantial, permits the inference that the problem was caused by a defect." A defect may be inferred from proof that the product did not perform as intended by the manufacturer . . ."

Id. (*quoting* Drier v. Perfection, Inc., 259 NW2d 496, 504 (SD 1977)).

> Identification of an existing defect is not essential to recovery upon express warranty. It is sufficient if, as here, the evidence demonstrates, either directly or by permissible inference, that the seed was defective in its performance or function or that it otherwise failed to conform to the warranty . . . There was no evidence that the seed purchased by appellee was tampered with or otherwise exposed to any elements that would alter its condition from the date it was purchased from appellant and the date it was planted by appellee . . . In this case, the trier of fact could reasonably have determined, without speculation or conjecture, that the crops' failure was the result of defects in the seed.

Schmaltz v. Nissen, 431 NW2d at 663.

[¶40] Plaintiffs have contended that other crops in the area sprayed with Authority® and Basis® would have been subject to the same variables but not all those crops suffered yield loss. DuPont is not entitled to summary judgment on the express contract claim based upon the claimed failures of the herbicides to control the weeds in plaintiffs' fields.

16

## VII. Fraud.

[¶41] Defendants contend that they are entitled to summary judgment on Count 5 of the amended complaint alleging fraud. In the absence of the previous determination that all tort claims must fail, DuPont would not be otherwise entitled to summary judgment on plaintiffs' fraud claim.

> Under South Dakota law, the essential elements of fraud are that:
>
>> 1) a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made;
>> 2) that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and
>> 3) that he [or she] did in fact rely on it and was induced thereby to act to his [or her] injury or damage.

Paint Brush Corp., Parts Brush Div. v. Neu, 1999 SD 120, ¶23, 599 NW2d 384, 391.

[¶42] Plaintiffs allege in the amended complaint that they purchased DuPont's products in reliance upon representations that the products would perform as promised and, if they did not, DuPont would pay to re-spray the affected crops. Plaintiffs allege that DuPont's statement that the products would work was false or made with reckless disregard for its truth or falsity. Plaintiffs allege that DuPont's statements as to how DuPont would perform if the products did not work was an intentional misrepresentation.

[¶43] In response to the motion for summary judgment, plaintiffs submitted the deposition testimony of Raisler that plaintiffs purchased a "program" which included a second in-crop (post emergence) application of herbicide if necessary for the control of weeds, with DuPont paying for up to the value of the product. Defendants' uncontested statement of facts sets forth that Raisler "settled"[6] some claims in South Dakota but did not settle the claims at issue in this case. Defendants claim the failure to do so was because of late notice and insufficient documentation provided by the Elevator. Curiously, defendants' statement of facts also sets forth that Greg Volk, an employee of the Elevator, testified that he promptly called Raisler about the claims at issue here.

---

[6]By "settled," I assume defendants mean that he took care of the re-spraying claims.

[¶44] The facts in the light most favorable to plaintiffs are that the product labels and DuPont's employee promised plaintiffs that the herbicides purchased would control the weeds on their crops and, if those herbicides failed to perform as promised, DuPont would pay for a re-spray. DuPont was allegedly promptly notified that the herbicides did not perform as promised but failed to promptly pay for or authorize a re-spray. As previously explained, questions exist as to whether plaintiffs should have proceeded to re-spray on their own (i.e. "cover") and then seek reimbursement.

[¶45] There is no genuine issue of material fact that Raisler did in fact authorize a re-spray on many acres in South Dakota upon which the Authority® and Basis® products were applied under the same "program." Plaintiffs rely upon this fact in support of their contention that re-spray was an express contract term. There is, however, no evidence that Raisler made the promise to re-spray if the products failed, although never intending to re-spray, or that he made any promise with the intent to deceive the plaintiffs. Based upon the undisputed facts, the evidence is insufficient "to allow a reasonable jury to return a verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d at 634. Defendants are entitled to summary judgment on Count 5 of plaintiffs' amended complaint alleging fraud. There are no genuine issues of material fact.

[¶46]**VIII. Punitive Damages.**

[¶47] Defendants contend that plaintiffs can not show clear and convincing evidence that defendants acted in a willful, wanton or malicious manner warranting punitive damages. SDCL § 21-3-2 provides, in part:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed . . . the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

"Since the statute is in the disjunctive, it is only necessary to prove one of the three [oppression, fraud, or malice]." Biegler v. American Family Mut. Ins. Co., 2001 SD 13, ¶ 44, 621 NW2d 592, 605.

> Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill will towards that person. Presumed malice may not, however, be motivated by hatred or ill will, but is present when a person acts willfully or wantonly to the

18

>  injury of others. It implies that the act complained of was conceived in the spirit of mischief or criminal indifference to civil obligations.

*Id.* South Dakota allows for punitive damages in cases alleging fraudulent inducement of a contract. *See* Grynberg v. Citation Oil & Gas Corp., 1997 SD 121, ¶ 27, 573 NW2d 493, 502. "[A] claim for presumed malice can be sustained by demonstrating a disregard for the rights of others." Kjerstad v. Ravellette Publications, Inc., 517 NW2d 419, 425 (SD 1994).

[¶48] Plaintiffs' negligence and strict liability claims fail. The facts, in the light most favorable to plaintiffs, do not support a claim for fraud in the inducement of a contract. Defendants are entitled to summary judgment on plaintiffs' claim for punitive damages. All claims arise out of contracts.

## IX. Motion to Strike.

[¶49] Defendants filed a motion to strike Counts 4 (strict liability) and 5 (fraud), along with the claim for punitive damages because such claims were not authorized when the motion to amend the complaint was granted. All of this is certainly true but it is unnecessary to reach this issue since defendants are entitled to summary judgment on those claims.

## X. Pioneer.

[¶50] No claims are alleged and this action should be dismissed against Pioneer. No cause of action is stated. In addition, there are no genuine issues of any material fact as to Pioneer.

## ORDER

[¶51] Based upon the foregoing,

[¶52] IT IS ORDERED:

  1. Defendants' motion, Doc. 54, for summary judgment is granted on Counts 1, 2, 4, and 5 of the plaintiffs' amended complaint and those claims are dismissed.

  2. The motion is denied as to plaintiffs' claims for consequential damages against DuPont in conjunction with the breach of contract claim.

  3. Defendants' motion, Doc. 52, to strike Counts 4 and 5 of the plaintiffs' amended complaint is denied as moot.

  5. This action is dismissed as to Pioneer Hi-Bred International, Inc. with costs to be taxed.

19

[¶53]  Dated this 7th day of February, 2006.

BY THE COURT:

*Charles B Kornmann*
CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: *Jill Blumer*
                    DEPUTY
     (SEAL)

20